'Active Desktop' feature of Windows 98 to promote third party brands. These restrictions similarly prevented OEMs from promoting rival browsers, such as Navigator, on the systems they sold.

48.     Moreover, Microsoft used threats, such as higher price structures for Windows than those being paid by competitors, and incentives, such as reductions in the royalty price of Windows, to induce especially important OEMs, such as Compaq, Gateway and IBM, to design their distributional, promotional and technical efforts to favour Internet Explorer to the exclusion of Navigator.

49.     When Microsoft's executives decided that the contractual restrictions placed on OEMs would not be sufficient to reverse the direction of Navigator's usage share, Microsoft set out, in late 1995 or early 1996, to technologically "bind" its two separate products— Internet Explorer and the Windows operating system. To that end, Microsoft excluded Internet Explorer from the "Add/Remove Programs" utility in Windows 98 (although it had been included in that utility in Windows 95). Microsoft also commingled the code related to browsing with other codes in the same files in Windows. These acts forced OEMs to sell Windows with Internet Explorer and prevented them from pre-installing non-Microsoft browsers because of the effect on OEM customer support costs and the possibility of end user confusion.

50.     In addition to its wrongful and anticompetitive acts in the OEM channel, Microsoft entered into additional anti-competitive agreements and arrangements to undermine any platform threat posed by Navigator including:

(a)     entering into agreements with major IAPs to provide easy access to their services from the Windows desktop in return for the IAPs' agreement to promote Internet Explorer exclusively and to keep shipments of internet access software using Navigator under a specified percentage. These agreements involved fourteen of the top fifteen IAPs, which accounted for a large majority of all internet access subscriptions in North America. Microsoft's agreements thus helped keep usage of Navigator below the critical level necessary for it to provide a real threat to

Microsoft's dominance in the market for Intel-compatible PC operating systems; and

(b)    agreeing to give certain ISVs "preferential support" in return for the ISVs' agreement to use Internet Explorer as the default browsing software for any software they developed with a hypertext-based user interface. The ISVs also agreed to use Microsoft's "HTML Help" (which is only accessible with Internet Explorer) to implement their applications' help functions. In these so-called "First Wave" agreements, signed between Fall 1997 and Spring 1998, Microsoft agreed to provide early beta versions of Windows 98 and Windows NT, other technical information, and the right to use certain Microsoft certifications, to important ISVs that agreed to Microsoft's terms, to the exclusion of rival browsers.

51.    The result of Microsoft's campaign against Netscape Navigator, actively participated in or facilitated by Microsoft Canada and others, was a dramatic reversal in usage share. Navigator's usage share in North America fell from above 80 percent in January 1996 to 55 percent in November 1997, and Internet Explorer's usage share rose from 5 percent to 36 percent over the same period. Internet Explorer's share in the North American market by the latter part of 1998 had reached approximately 50 percent. Internet Explorer's share has been steadily rising as Windows 95 users have converted to Windows 98 and to subsequent versions of Microsoft Operating Systems. Recent estimates place Internet Explorer's worldwide share at more than 95 percent of the market. With such limited reach, Navigator no longer posed a threat to Microsoft.

**Microsoft's Campaign Against Java**

52.    For Microsoft, a key to maintaining and reinforcing the applications barrier to entry has been preserving the difficulty of porting applications from Windows operating systems to other platforms, and vice versa.

53.    In May 1995, Sun announced that it had developed the Java programming language. The Java technology enables applications written in the Java language to run on a variety of platforms with minimal porting. Java was a significant development because as it

became easier for ISVs to port their applications to different operating systems with the result that more applications would be written for operating systems other than Windows and the "applications barrier" that protected Microsoft's dominance in the market for Intel-compatible PC operating systems would be undermined.

54.     In May 1995, Netscape agreed to include a copy of Sun's Java with every copy of Navigator. Navigator quickly became the principal vehicle by which Sun placed copies of Java on the PC systems of Windows users, and as Navigator grew in popularity, the distribution of Java increased as well.

55.     By 1996, senior executives at Microsoft had become aware that a significant number of ISVs were writing network-centric applications in the Java programming language, and that Java was likely to increase in popularity among ISVs. Microsoft therefore became interested in maximizing the difficulty with which applications written in Java could be ported from Windows to other platforms, and vice versa (thereby undermining Java's cross-platform threat). Microsoft engaged in various anti-competitive agreements and arrangements to accomplish this purpose, including:

(a)     licensing and then corrupting Java, by creating Microsoft-specific Java development tools and a Windows-compatible Java runtime environment that made porting more difficult than with the Sun version of Java;

(b)     discouraging business allies, such as Intel, from cooperating with Sun, by threatening that cooperation with Sun on Java would jeopardize business relationships with Microsoft. As a result of just such a threat, Microsoft obtained Intel's agreement to stop assisting Sun in or about the spring of 1996; and

(c)     entering "First Wave" agreements with ISVs in 1997 and 1998, conditioning release of early beta versions of Windows 98 and Windows NT, other technical information, and the right to use certain Microsoft certifications, on the agreement of those ISVs to use Microsoft's non-compliant version of Windows Java as the "default."

56. In addition to the wrongful and anti-competitive acts targeted specifically at Java, Microsoft's efforts to prevent widespread distribution of Navigator also served to undermine the threat posed by Java. Because Navigator had become the principle distribution vehicle for cross-platform variants of Java on Windows, as Microsoft succeeded in limiting Navigator's reach, it also limited distribution of Java.

57. As a direct result of Microsoft's wrongful and anti-competitive conduct, actively participated in or facilitated by Microsoft Canada and others, the cross-platform threat posed by Java to Microsoft's dominance in the market for Intel-compatible PC operating systems was eliminated.

58. As a further result of Microsoft's wrongful and anti-competitive conduct, in combination with and furthered by Microsoft Canada and other participants, Microsoft has and continues to expand market share for its own middleware platform called the .NET.

**Microsoft's Campaign Against Threats Posed by Media Technologies**

59. RealNetworks produces software that supports the "streaming" of audio and video content from the web. RealNetworks' streaming software presents a set of APIs that compete with Microsoft's multimedia DirectX software for ISVs' attention. Versions of RealNetworks' software were developed for multiple operating systems including Windows, Apple's Mac OS and Linux. In 1997, Microsoft sought to convince RealNetworks to abandon development of its streaming media software and to adopt Microsoft's multimedia platform. In response to the continuing threat posed by RealNetworks' streaming media platform, Microsoft has bundled its media software to Windows in a manner similar to the bundling of Internet Explorer in its campaign against Netscape Navigator. Microsoft continues to undermine RealNetworks by withholding technical information.

60. Microsoft has also engaged in anti-competitive and unlawful conduct against Burst as part of its efforts to maintain the applications barrier to entry protecting its operating systems monopoly. Burst was the developer of video streaming technology that would enable a media provider to perform extremely efficient transmissions of time-based media over networks. Microsoft's unlawful conduct directed at Burst included, among

other things, misappropriating Burst's intellectual property and using that intellectual property to release competing products.

**Microsoft's Campaign Against Other Middleware Threats**

61.    Microsoft responded with similar wrongful and anti-competitive conduct against other middleware and analogous threats to Microsoft's dominance in the market for Intel-compatible PC operating systems.

62.    In 1995, Intel was in the advanced stages of developing software, called NSP software that would endow Intel's x86 microprocessors with enhanced graphics and video performance. Intel did not believe that Windows had kept pace with advances in Intel's processors. Consequently, Intel designed its NSP software to expose its own set of APIs, which, if used by ISVs, would make porting of their software to non-Microsoft operating systems easier. In or about August 1995, Microsoft threatened Intel that it could not count on Microsoft to support Intel's next generation of processors as long as Intel was developing platform software that competed with Windows. In the face of this threat, by the summer of 1996, Intel agreed to stop developing platform interfaces that might attract ISVs' attention away from Windows.

63.    Samba is open source software that allows Linux or Unix machines to act as file, print and authentication servers for Windows clients. Samba permits servers and Intel-compatible PCs running Linux to co-exist in networks that include Windows servers and PCs. Microsoft, though, uses and refuses to document certain undocumented interfaces to communicate between their servers and client PCs. Therefore, PCs running Linux are not fully inter-operable on a Windows network which has created a barrier to the adoption of Linux PCs. Microsoft has refused to document certain features of these interfaces.

64.    Microsoft's approach to Samba is part of a broader three part strategy for eliminating competition in the workgroup server market. First, Microsoft used its logo and certification programs for its Microsoft Operating System so that developers would write applications that would also run on its workgroup server operating system. Second, Microsoft intentionally excluded rivals like Sun and Samba from the workgroup server

operating system market by refusing to disclose technical information to them. Third, Microsoft bundled critical networking functions and features into its Microsoft Operating System products, and designed those functions and features so that customers cannot fully use them unless they also purchase Microsoft's workgroup server operating systems. As a result, consumers could not substitute a non-Windows workgroup server operating system if they wished to use all of the functions and features of Windows that they purchased as part of their Microsoft Operating System.

65.     By intentionally denying non-Microsoft workgroup servers the ability to fully use the functions and features of the Microsoft Operating Systems, but not similarly restricting Microsoft workgroup servers, Microsoft has increased the costs for end users to use products that compete with Microsoft. If end users switch operating systems they need to replace every Microsoft device or product that connects to it. As a result, Microsoft has been able to charge supra-competitive prices for its products.

## MICROSOFT'S DOMINANCE IN THE INTEL-COMPATIBLE PC APPLICATIONS SOFTWARE MARKET

66.     Having secured its dominance in the Intel-compatible PC operating systems market, Microsoft has abused that dominance to gain unfair advantages in the complementary applications software markets. In the late-1980's, Microsoft recognized that the transition to GUIs, where it had a strong market position with its Windows operating environment, provided Microsoft an opportunity to gain an important presence in applications, such as, word processors and spreadsheets.

67.     Since the early 1990's, Microsoft has possessed a dominant, persistent and increasing share of the North American market for Intel-compatible PC word processing applications software. Microsoft Word presently enjoys North American market share in the order of 95 percent.

68.     During that same period, Microsoft has also possessed a dominant, persistent and increasing share of the North American market for Intel-compatible PC spreadsheet applications software. Microsoft Excel presently enjoys North American market share in the order of 95 percent.

69. Because of a lack of realistic alternatives to word processor and spreadsheet applications, and the prohibitive expense involved in developing new word processor or spreadsheet applications software that could become a viable alternative to Microsoft Applications Software, Microsoft has abused its dominant position by charging supra-competitive prices for its Microsoft Applications Software that are substantially above what it could charge in a competitive market. Indeed, Microsoft has done so for a significant period of time without losing market share to competitors. Microsoft Canada and others actively participated in or facilitated Microsoft's unlawful conduct.

## MICROSOFT'S ABUSE OF ITS DOMINANT POSITION IN THE INTEL-COMPATIBLE PC APPLICATIONS SOFTWARE MARKETS

70. When Microsoft's anti-competitive applications software campaign began in the late 1980's and early 1990's, there were several existing competitors in both markets. Lotus 1-2-3 was the market leader in spreadsheets, and WordPerfect was the market leader in word processors. Beginning as early as 1988, Microsoft embarked upon a campaign to prevent or lessen competition substantially and to thereby increase the price of its products in the market for Intel-compatible PC applications software. Microsoft Canada and others actively participated in or facilitated that campaign. As a part of the campaign, Microsoft and Microsoft Canada combined or agreed with others, including IAPs, ISVs, OEMs, and Intel to prevent or lessen, unduly, competition and to otherwise restrain or injure competition unduly. As a consequence, Microsoft has unlawfully maintained and abused its dominant position in the North American market for Intel-compatible PC operating systems and has charged supra-competitive prices.

### Microsoft's Campaign to Misdirect Developers' Resources Towards OS/2

71. In the late-1980's, Microsoft began jointly developing OS/2 with IBM as the "operating system of the 1990's" and as the successor to DOS. Unlike DOS, which had a character-based interface, OS/2 would have a GUI. OS/2 would also have other technical advantages over DOS.

72.  Beginning in 1989, Microsoft engaged in a concerted effort to convince the ISV Lotus to write the next version of its Lotus 1-2-3 spreadsheet to run on OS/2. Microsoft similarly engaged in an effort to persuade the ISV-WordPerfect to write the next version of its WordPerfect word processing software to run on OS/2. Microsoft successfully arranged for the two developers to write their applications for the new platform and both Lotus and WordPerfect subsequently devoted substantial resources to writing their applications for OS/2 in reliance on Microsoft's representations about the platform.

73.  By November 1989, Microsoft decided internally to abandon its commitment to OS/2 and focus instead on MS-DOS and Windows. Even after Microsoft had made that decision, however, it continued to misrepresent its intentions for OS/2 to its ISV partners to induce them to develop applications for OS/2. While Lotus and WordPerfect continued to devote development resources to OS/2, Microsoft moved forward with development of its own applications software for Windows. When Microsoft finally disclosed its intentions concerning OS/2, Microsoft had already gained a critical first-mover advantage for its Excel spreadsheet applications and its Word word processor applications on the Windows platform.

**Microsoft's Selective Disclosure of Technical Information**

74.  Microsoft understood the need for competing applications developers to have access to the technical underpinnings of the Microsoft Operating Systems on an equal basis with its own applications developers. Certain Microsoft executives falsely claimed that Microsoft had created a "Chinese wall" that prevented its own applications software developers from having preferential access to technical information about the Microsoft Operating Systems. In reality, Microsoft's applications and middleware developers did have preferential access to such technical information. As early as 1988 and 1989 Microsoft began using undocumented APIs in its applications and middleware that were not available to outside developers and continued this practice to at least 2001.

75.  Microsoft could have chosen to provide timely access to the Microsoft Operating Systems specifications to competing ISVs and others in the normal course of business. Indeed, Microsoft provided some smaller ISVs - in the so called "First Wave" agreements

- with preferential access to technical information about Microsoft's Operating Systems provided that these ISVs agreed not to develop applications that competed with Microsoft's applications. However, with respect to leading ISVs such as Lotus and WordPerfect (later owned by Corel, a Canadian corporation), Microsoft chose to preclude, limit or delay such access in order to be first to market with Word and Excel and thereby create an unfair advantage for its own products over its direct competitors' products in the word processor and spreadsheet markets.

**Microsoft's Other Campaigns in the Applications Software Markets**

76.    In order to obtain and maintain its dominance in the applications software markets, beginning in the early 1990's and continuing throughout the Class Period, Microsoft has engaged in the following anti-competitive acts participated in or facilitated by Microsoft Canada and others:

(a)    threatening OEMs that they would receive a license for Windows only if they agreed not to offer competitors' non-Microsoft applications software;

(b)    threatening OEMs that it would increase the price for its Microsoft Operating Systems if the OEMs distributed non-Microsoft applications software;

(c)    threatening to withhold from OEMs market development funds if the OEMs distributed non-Microsoft applications software;

(d)    providing discounts to purchasers who agreed to purchase only Microsoft Applications Software;

(e)    providing discounts to purchasers who limited their distribution of non-Microsoft Applications Software;

(f)    threatening OEMs that Microsoft would withhold technical support for Microsoft's Operating Systems, including Windows, if the OEMs offered competitors' non-Microsoft applications software; and

(g)     raising the price of Windows to smaller OEMs in exchange for an agreement from larger OEMs with comparatively greater market share to offer Microsoft Applications Software exclusively.

77.     Microsoft's and Microsoft Canada's wrongful and anti-competitive campaigns against Navigator, Java, and others, as described above also served to secure and maintain Microsoft's dominance in the spreadsheet and word processor applications software markets.

78.     Moreover, had Microsoft not undermined the browser and Java innovations described above, word processor and spreadsheet software applications could have been written for the Java platform. These applications would have competed with Microsoft Word and Microsoft Excel, but would have run on a multitude of operating systems. As a consequence, Microsoft would have lost its capacity to exclude competitors to Word and Excel.

**Microsoft's Anti-competitive Use of Office Related Applications To Maintain Its Dominance In The Operating Systems and Applications Markets.**

79.     Microsoft uses its dominance in the applications market, and in particular its dominance of office related applications such as word processors (e.g. Microsoft Word) and spreadsheets (e.g. Microsoft Excel), to protect its operating system monopoly. Because these office applications are the primary way in which the majority of end users interact with their PC, Microsoft uses these applications to maintain a barrier to entry that protects Microsoft's operating system monopoly.

80.     Microsoft controls whether these office applications can be ported to competing platforms. Using that control, Microsoft has refused to port these office applications to competing platforms in order to wrongfully maintain its dominance, and it has used these applications to exact anti-competitive agreements in exchange for continued support on competing platforms.

81.     By controlling the office applications, Microsoft also controls the file formats generated by these applications. To maintain its monopoly position and decrease competition,

Microsoft has adopted Microsoft-specific file formats, thereby obstructing competitors' abilities to interoperate with such files. Consequently, competing office applications, like Sun's StarOffice, Corel WordPerfect Office and Lotus SmartSuite, are unable to read or duplicate these Microsoft-specific file formats in the same manner as Microsoft's office applications. By precluding full interoperability with competing office productivity applications, Microsoft obstructs competition.

82. Microsoft also uses its control of office applications to create technical ties and dependencies that force consumers to purchase additional Microsoft server products, including Microsoft Exchange Server, Microsoft Internet Information Server, and Microsoft SQL Server. In order to effectively use all of the office applications' functions in such a network, a user must purchase these additional Microsoft products. As a result, if a user later wishes to switch its applications or operating system, it will incur increased costs because it necessarily will have purchased and implemented not just the office applications, but a number of other Microsoft products as well. These technical ties and dependencies are intentionally designed by Microsoft to raise the barriers to entry protecting its monopoly positions by significantly raising the costs of switching to non-Microsoft products.

**FINDINGS OF FACT AND LAW FROM FOREIGN PROCEEDINGS**

83. The plaintiffs adopt and rely on:

    (a)    the findings of fact and law from the August 21, 1995 final judgment in *United States v. Microsoft Corp.*, Civ. No. 94-1564 (D.D.C., complaint filed July 15, 1994);

    (b)    the findings of fact from *United States v Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) as modified on appeal by the findings of fact and law in (c) below;

    (c)    the findings of fact and law from *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001);

(d)     the findings of fact and law from the European Commission's Decision of March 24, 2004 relating to a proceeding under Article 82 of the EC Treaty (Case COMP/C-3/37.792 Microsoft);

(e)     the findings of fact and law from the European Commission's Decision of 12 July 12 2006 to Impose Penalty Payments on Microsoft;

(f)     the findings of fact and law from the European Commission's Decision of 16 December, 2009 in Case COMP/39.530 — Microsoft (Tying), notified under document C(2009) 10033; and

(g)     the findings of fact and law from the European Commission's Decision of 6 March, 2013 in Case COMP/39.530 – Microsoft (Tying), notified under document C(2013) 1210.

## MICROSOFT'S CONDUCT WAS AND CONTINUES TO BE ILLEGAL IN THE UNITED STATES AND EUROPE

84.     Microsoft's conduct that is particularized in this statement of claim took place and continues to take place in, among other places, the United States and Europe where it was and continues to be illegal and contrary to the competition laws of the United States and Europe.

## THE INTENTIONAL INTERFERENCE WITH ECONOMIC INTERESTS

85.     The defendants' wrongful and anti-competitive acts as particularized at paragraphs 8 to 84 and 90~~89~~ to 92~~91~~ was unlawful conduct intended to injure the plaintiffs and the other Class Members by artificially increasing the price they were required to pay to acquire Intel-compatible PC operating systems and Intel-compatible PC applications software <u>as a means of enriching the defendants</u>.

~~86.    The defendants' wrongful and anti-competitive acts as particularized at paragraphs 8 to 84 and 89 to 91 constituted unlawful conduct, namely:~~

~~(a)    an unlawful restraint of trade at common law and equity;~~

(b)     an offence in relation to competition contrary to Part VI of the Competition Act in that the defendants:

  (i)     combined or agreed with certain IAPs, ISVs, OEMs (including Budgetron, Dell, Gateway, Hewlett Packard, Acer, Lenovo, Toshiba, Sony, LG Electronics, Panasonic, Fujitsu/Fujitsu Siemens, Averatec, and IBM), and Intel to prevent or lessen, unduly, competition and to otherwise restrain or injure competition unduly. Microsoft and Microsoft Canada dictated the terms of these combinations and agreements, and were aware or ought to have been aware that the effect of the agreements would be to prevent or lessen competition unduly; and

  (ii)     knowingly or recklessly made false or misleading representations to the public;

(c)     an illegal violation of, among other things, United States and European antitrust law; and

(d)     conduct which is prohibited by the Microsoft's own corporate policies, including its Standards of Business Conduct, which state that:

  We manage our business in compliance with laws and regulatory requirements.

  ...

  Fair Competition and Antitrust: As a global business, we encounter laws and regulations designed to promote fair competition and encourage ethical and legal behavior among competitors. Antitrust laws and fair competition laws generally prohibit any activity that restrains free trade and limits competition. We conduct our business in compliance with these laws.

86. The defendants' wrongful and anti-competitive acts support civil actions for damages or compensation under Canadian law and under the law of the jurisdiction in which the acts took place. In particular, had Microsoft's competitors and potential competitors set out in paragraphs 20 to 82 suffered loss they would have claims against Microsoft for:

(a)    unlawful conspiracy;

(b)    damages under s. 36 of the *Competition Act*;

(c)    damages arising from breaches of the *Sherman Act*, CH. 647, 26 Stat. 209, *codified* at 15 U.S.C. ss 1-7; and

(d)    damages arising from breaches of Articles 101 and 102 of the *Treaty on the Functioning of the European Union*.

87. The conduct of Microsoft was intended to harm the plaintiffs and compelled them to pay the artificially high prices for Intel-compatible PC operating systems and Intel compatible PC applications software. Alternatively, the harm to the plaintiffs and other Class Members was a necessary means of achieving the end of enriching the defendants.

87-88 The plaintiffs and the other Class Members have suffered economic loss as a result of the defendants' conduct which had the effect of raising, maintaining and stabilizing prices of Intel-compatible PC operating systems and Intel-compatible PC applications software at artificially high and non-competitive levels.

88-89 The defendants' wrongful and anti-competitive acts as particularized at paragraphs 8 to 84 and 90-89 to 92-91 constituted tortious interference with the economic interests of the plaintiffs and the other Class Members and renders Microsoft and Microsoft Canada liable to pay the resulting damages.

## THE CONSPIRACY

89-90. The Canadian subsidiary, Microsoft Canada, participated in and furthered the objectives of the conspiracy by knowingly modifying its competitive behaviour in accordance with instructions received from its parent company, Microsoft. Microsoft Canada thereby acted in concert with Microsoft in carrying out the conspiracy and is liable for such acts.

90-91. During the Class Period, at times and places some of which are unknown to the plaintiffs the defendants wrongfully, unlawfully, maliciously and lacking *bona fides* conspired and agreed together, the one with the other or others of them, and with their servants and agents as follows:

(a)    to suppress and eliminate competition in the sale and supply of Intel-compatible PC operating systems and Intel-compatible PC applications software in Canada and elsewhere; and

(b)    to prevent or lessen, unduly, competition in the development, production and manufacture of Intel-compatible PC operating systems and Intel-compatible PC applications software.

91 92. The defendants were motivated to conspire and their predominant purposes and predominant concerns were:

(a)    to harm the plaintiffs and the other Class Members by requiring them to purchase Microsoft Operating Systems and Microsoft Applications Software rather than products of competitors in the Intel-compatible PC markets;

(b)    to harm the plaintiffs and the other Class Members who purchased Microsoft Operating Systems and Microsoft Applications Software by requiring them to pay artificially high prices; and

(c)    to unlawfully increase their profits on the sale of Microsoft Operating Systems and Microsoft Applications Software to consumers in Canada.

92 93. In furtherance of the conspiracy, during the Class Period, the following acts were done by the defendants and their servants and agents:

(a)    they met secretly in the United States and Canada from time to time to discuss the issues giving rise to the conspiracy;

(b)    they directed their servants, agents and employees from time to time to perform wrongful or unlawful acts in furtherance of the conspiracy;

(c)    they met secretly in the United States and Canada from time to time to monitor the effects of the conspiracy;

(d) they instructed members of the conspiracy at meetings not to divulge the existence of the conspiracy; and

(e) they carried out the acts pleaded in paragraphs 8 to 84 and ~~90~~89 to ~~92~~91.

~~93~~92.A. The defendants' conduct particularized in paragraphs 8 to 84 and ~~90~~89 to ~~92~~91 constituted the following ——unlawful and illegal acts; for the reasons set out in paragraphs 86(a) to 86(d) above.

(a) an unlawful restraint of trade at common law and equity;

(b) an offence in relation to competition contrary to Part VI of the Competition Act in that the defendants;

    (i) combined or agreed with certain IAPs, ISVs, OEMs (including Budgetron, Dell, Gateway, Hewlett Packard, Acer, Lenovo, Toshiba, Sony, LG Electronics, Panasonic, Fujitsu/Fujitsu Siemens, Averatec, and IBM), and Intel to prevent or lessen, unduly, competition and to otherwise restrain or injure competition unduly. Microsoft and Microsoft Canada dictated the terms of these combinations and agreements, and were aware or ought to have been aware that the effect of the agreements would be to prevent or lessen competition unduly; and

    (ii) knowingly or recklessly made false or misleading representations to the public;

and

(c) an illegal violation of, among other things, United States and European antitrust law.

93.94 The defendants' conduct particularized in paragraphs 8 to 84 and 9089 to 9291 was wrongful and unlawful for the reasons set out in paragraphs 93A86(a)-(d) above. This wrongful and unlawful conduct was directed towards the plaintiffs and other Class Members, which conduct the defendants knew or should have known in the circumstances would likely cause injury to the plaintiffs and the other Class Members. The plaintiffs and other Class Members have suffered damages as a result of the defendants' conduct particularized herein.

94.95 The defendants' conduct as particularized at paragraphs 8 to 84 and 9089 to 9291 constituted a tortious conspiracy to injure the plaintiffs and the other Class Members and renders the defendants liable to pay the resulting damages.

## VICARIOUS LIABILITY

95.96 The acts alleged in this statement of claim to have been done by each corporate defendant were authorized, ordered and done by each corporate defendant's officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of its business affairs in pursuit of the defendants' overall business plans and therefore are acts for which the defendants are vicariously liable.

## UNJUST ENRICHMENT AND WAIVER OF TORT

96.97 In the alternative, the plaintiffs plead that they and the other Class Members are entitled to recover the unjust enrichment accruing to the defendants. In the further alternative, the plaintiffs waive the tort and plead that they and the other Class Members are entitled to recover the unjust enrichment accruing to the defendants rather than their tort damages.

97.98 The defendants have each been unjustly enriched by the receipt of the Overcharge on the Microsoft Operating Systems and Microsoft Applications Software sold to end users in British Columbia. The plaintiffs and the other Class Members have suffered a deprivation in the amount of the Overcharge attributable to these sales in all of British Columbia.

99.99 Since the Overcharge received by the defendants from the plaintiffs and each Class Member results from the defendants' wrongful and unlawful acts as described in paragraphs 8 to 84 and 90,89 to 92,91, there is and can be no juridical reason justifying the defendants' retaining any part of the Overcharge. In particular, the contracts by which the defendants purport to have received the overcharge are illegal and void because:

(a) they violate and are prohibited by Part VI of the Competition Act in that the defendants combined or agreed with others, including OEMs and other direct purchasers, to prevent or lessen, unduly, competition and to restrain or injure competition unduly. These agreements and combinations are particularized in paragraphs 12, 19, 21, 24, 25, 31-35, 37, 42, 47-51, 57, 69, 76 and 83 above. Microsoft and Microsoft Canada dictated the terms of these agreements and combinations, and were aware or ought to have been aware that the effect of the agreements would be to prevent or lessen competition unduly;

(b) they violate and are part of a course of conduct that violates United States antitrust law;

(c) they are prohibited by and violate Microsoft's own corporate policies; and

(d) they violate public policy and are an unlawful restraint of trade at common law and equity.

99.100.The plaintiffs plead that, in the circumstances, justice and good conscience require the defendants to account to them and to the other Class Members for the Overcharge on the Microsoft Operating Systems and Microsoft Applications Software sold in British Columbia.

100.101 Further, in all the circumstances, justice and good conscience requires that the defendants be required to disgorge to the plaintiffs and the other Class Members an amount equal to the Overcharge from the sales of Microsoft Operating Systems and Microsoft Applications Software in British Columbia.

## THE RESULTING DAMAGES OF THE PLAINTIFFS AND THE OTHER CLASS MEMBERS

101 102. The plaintiffs and the other Class Members have suffered damages as a result of the defendants' wrongful and unlawful acts as described in paragraphs 8 to 84 and 90 89 to 92 91, which had the effect of raising, maintaining and stabilizing prices of Microsoft Operating Systems and Microsoft Applications Software at artificial and non-competitive levels throughout the Class Period.

102 103 During the Class Period, the plaintiffs and other Class Members have purchased billions of dollars of Microsoft Operating Systems and Microsoft Applications Software. By reason of the defendants' tortious interference with their economic interests and conspiracy to injure, the plaintiffs and the other Class Members paid more for Microsoft Operating Systems and/or Microsoft Applications Software than they would have paid in the absence of Microsoft's wrongful and unlawful conduct and, as a result, have suffered damages.

103 104 The plaintiffs assert that their combined damages and those of the other Class Members are capable of being reasonably estimated on an aggregate basis as the difference between the prices actually obtained by the defendants and the prices which would have been obtained in the absence of the defendants' wrongful and unlawful conduct.

## PUNITIVE DAMAGES AND COSTS

104 105 The plaintiffs plead that the defendants' wrongful conduct, as particularized above in paragraphs 8 to 84 and 90 89 to 92 91.

(a) exploits the vulnerability and needs of the Class Members;

(b) is high-handed and outrageous and constitutes profiteering from the needs of vulnerable, unsuspecting consumers;

(c) is motivated solely by economic considerations; and

(d) is anti-competitive and unlawful.

105.106    The defendants' wrongful acts as particularized above are tortious, unlawful, offend the moral standards of the community, warrant the condemnation of the Court, were high handed, malicious, arbitrary or highly reprehensible and departed to a marked degree from ordinary standards of decent behaviour and render the defendants liable to pay punitive damages which the Court should fix as a percentage of the revenue from the Overcharge on the sales of Microsoft Operating Systems and Microsoft Applications Software in British Columbia.

106.107    The plaintiffs and the other Class Members are also entitled to recover as damages or costs in accordance with the *Act* the costs of administrating the plan in this action.

## THE RELEVANT STATUTES

107.108    The plaintiffs plead and rely upon the *Act* and Part IV and Part VI of the *Competition Act* and all amendments thereto.

WHEREFORE the plaintiffs claim against the defendants on their own behalf and on behalf of the Class:

(a)    an Order pursuant to the *Act* certifying this action as a class proceeding and appointing it as representative of the Class;

(b)    damages, including punitive damages, for tortious interference with economic interests or relations in such sum as the Court finds appropriate;

(c)    damages, including punitive damages, for conspiracy to injure and/or unlawful means conspiracy in such sum as the Court finds appropriate;

(d)    damages including the full cost of investigation as per section 36, *Competition Act*, R.S.C. 1985, c. C-34,

(e)    a declaration that Microsoft and Microsoft Canada have been unjustly enriched at the expense of the plaintiffs and the other Class Members by their receipt of the Overcharge;

(f)     a declaration that Microsoft and Microsoft Canada account for and make restitution to the plaintiffs and the other Class Members in an amount equal to the Overcharge;

(g)     judgment in an amount equal to the Overcharge;

(h)     an Order directing a reference or giving such other directions as may be necessary to determine issues not determined at the trial of the common issues;

(i)     pre-judgment and post-judgment interest;

(j)     the costs of administering the plan of distribution of the recovery in this action in such sum as the Court finds appropriate; and

(k)     such further and other relief as this Court deems just.

Place of trial:  Vancouver, British Columbia

Dated December 22, 2004

J.J. Camp, Q.C.
Camp Fiorante Matthews
Solicitors for the Plaintiffs

This Writ of Summons and Statement of Claim is filed by J.J. Camp, Q.C., Camp Fiorante Matthews, 400 – 555 West Georgia Street, Vancouver, British Columbia, V6B 1Z6. Telephone: (604) 689-7555